Good morning, everyone. We'll get started in a few minutes. All right. We're ready. Good morning, everyone. Welcome to the Ninth Circuit. Judge Bress and I are pleased to welcome back Judge Bennett from the District of Maryland. It's always a pleasure to have you, Judge Bennett. It's always an honor to be here. Thank you. I'm sorry, I forgot my glasses back there. No problem. I'll call the cases in the order that they're listed. The first one, Leon v. Bondi, has been submitted on the briefs and records. So the first case up for argument is Wilson v. Lynch. Good morning, counsel. Good morning, Your Honor. Good morning. May it please the Court. Anais Corral, on behalf of Petitioner Anthony Roy Wilson, I would like to reserve two minutes for rebuttal. All right. During the most critical moment of Mr. Wilson's trial, the prosecution deliberately informed the jury of a key out-of-court witness statement that impeached Mr. Wilson and went directly to his theory of defense. The State Appellate Court misapplied Darden in failing to find that this error had a reasonable probability of affecting the verdict in a case where the trial judge said that the error was, quote, very important, and a juror explicitly brought up the error in an interview. This question, the dude-has-a-hammer question, was prejudicial, highly prejudicial, for four reasons. First, Mr. Wilson's defense turned on his state of mind, namely if he was scared or surprised when he approached Anthony Stevens' car and Mr. Stevens emerged holding a gun. And this question implied that Mr. Wilson knew of the gun before approaching the car, directly undermining whether he was scared or surprised when doing so. And it also came at the most critical point of trial when Mr. Wilson – Let me ask you this, because I have a little bit of trouble with your argument. We're on very deferential review. The trial judge had interviewed all of the jurors, most of them couldn't even remember, and had thoroughly instructed the jury to disregard the evidence. So is there anything in the record that indicates that admonishment was not followed? Your Honor, there's nothing that explicitly indicates the jurors did not follow the admonishment. However, there was a significant delay between the admonition and – between the error and the admonition, which meant that the admonition was ineffective. There was a six-day gap between the highly prejudicial question and the jail call transcripts that the jury reviewed, and then the court's admonition, which restated word-for-word the problematic dude-has-a-hammer question. And in those six days, the jury either may have forgotten the question and then were reminded of it word-for-word upon their return, or that question may have become cemented in their mind. And the Supreme Court instructs us in Greer that a curative admonition should occur immediately after misconduct. And while it's not binding precedent, I would like to point out the Sixth Circuit Sullivan case in which the court stated that corrective measures should be taken immediately in instances of prosecutorial misconduct. And there the Sixth Circuit found that an admonition, a curative instruction, given 20 minutes after the instance of prosecutorial misconduct was not sufficient. Is it so clear there even was misconduct here, though? Yes, Your Honor, there was misconduct. There was misconduct under the Supreme Court's Berger standard because the question suggested to the jury that the prosecutor had an out-of-court statement which contradicted Mr. Wilson's testimony, of which no proof was offered. The prosecutor herself admitted that she couldn't offer proof of the statement because the police interrogation that the statement had come from was never admitted into evidence. There was never any attempt to admit it into evidence. And Tanner himself could not be called to testify, which the prosecutor admitted to, because he retained the right to remain silent. Tanner had been a co-defendant and severed, correct, from the case? Correct, yes. Is it the colloquy, Ms. Carroll, that the prosecutor just merely asked, isn't it true, Mr. Wilson, that you never yelled, gun? The defense here wasn't so much as aware of — he essentially had a defense of self-defense, correct? That was — he testified, and he testified as to acting in self-defense, correct? He did, yes. And does the record reflect that he indicated in that area of Oakland that everybody carries a gun? So, two responses, Your Honor. First, there was testimony that he said everyone has a gun, but Mr. Wilson later backed off of that testimony upon cross-examination, saying to the effect it was hyperbole. He didn't actually think that, just because he said everyone had a gun, that Stevens had a gun when he approached the car. And he testified that in cross-examination. But that would go to his — his state of mind, necessarily, in terms of his self-defense argument, correct? That would go to his state of mind. And I would also like to point out, though, that defense counsel, in closing, also argued for the lesser included offense of voluntary manslaughter. And again, this question went directly to the voluntary manslaughter element, which required showing that the defendant acted rashly and under the influence of intense emotion. If Mr. Wilson knew of the gun before approaching the car, it would be far less likely that he would be acting under the influence of intense emotion, namely fear, surprise, when Stevens emerged from the gun holding a car, which Mr. Wilson was not expecting. The colloquy, though, is not, I believe, in the record, is that, prosecutor, isn't it true, Mr. Wilson, that you never yelled gun? And then Wilson responds, I actually did. I probably didn't yell it loud, but I actually said gun. Isn't it true that you already knew he had a gun? And then that's where he said, I did not. And then that, and only that triggered the prosecutor to then say, isn't it true that Kermit Tanner had already told you all dude has a hammer? And then Mr. Wilson testified he never said that. And then the question was, isn't that why you were afraid for Kermit Tanner to actually come and testify? And he said no. That's the precise colloquy we're dealing with here, correct? That is, Your Honor, yes. And isn't that, in and of itself, your argument is, constitutes prosecutorial misconduct? Yes. The question, isn't it true that Kermit Tanner had already told you all dude has a hammer is misconduct because it incorporates an out-of-court police statement that could not be proved. And again, the first question, isn't it true that you already knew he had a gun? I did not, is fine, but to follow it up with a question incorporating an inadmissible extrajudicial police statement, word for word, is misconduct under the Berger standard. But didn't the trial court think it was there was a good faith basis for asking the question? That the trial court did find that and it struck the question. But again, that's not the federal standard for misconduct that Berger lays out, which says, quote, it's improper. Excuse me. It's improper for a prosecutor to, quote, suggest by his questions that statements had been made to him personally out of court in retrospect of which no proof was offered. And that's exactly what happened. I mean, I don't know that the prosecutor was saying that statements had been personally made to her. So the statement incorporated, again, an extrajudicial police statement. We know that there was no audio recording of the area in which the incident occurred. So the only reasonable inference that the jury could make, which is correct, is that that statement was given by Kermit Tanner, word for word, dude has a hammer, to the police, and that the prosecutor knew about that statement. And I would like to point out this court's ruling in Sanchez, which I think is factually on point, where this court held that it's improper under the guise of artful cross-examination to tell the jury the substance of inadmissible evidence. And there the court found that extrajudicial statements made by the defendant's wife to an investigator could not be used on cross-examination of the defendant because there was no showing that they were admissible. And the court found that there was prosecutorial, prejudicial prosecutorial misconduct in that instance. But did not the district court, as well as the California Court of Appeals, essentially find that the prosecutor was not asking about the statement that Tanner made to the police, but the statement that he may have made to Wilson before the murder of the decedent? Isn't that correct? They did find that, Your Honor. But the prosecutor cannot have an end run around the misconduct issue simply by leaving out the fact that the statement came from a police interrogation. It's still misconduct to suggest that she had those facts that she could not prove. And it went directly to Mr. Wilson's credibility and to his state of mind. It was highly prejudicial. The Anti-Terrorism and Effective Death Penalty Act, I usually call it a DIPA, I guess is how you pronounce it. The review here is that the, this court can only grant the relief you request if every fair-minded jurist would find the California Court of Appeals decision was a result of an unreasonable application. It's a pretty high bar you have to reach, isn't it? That is a high bar, Your Honor. And we can reach it. This was an unreasonable application of the Darden standard. The state appellate court held that the question was not prejudicial prosecutorial misconduct only because Wilson denied the statement and the inquiry was stricken from the record. But that failed to put the statement in the context of the trial as is required by Darden. And there's various facts that the state appellate court did not consider as to prejudice, which demonstrate that the statement was highly prejudicial. It again came at the most critical point of trial when Mr. Wilson, the defendant, was taking the stand in his own defense when the jury is highly tuned in in judging his credibility. It was bolstered by the jail calls transcripts that were produced to the jury immediately after the statement and which indicated that Mr. Wilson was afraid of Mr. Tanner testifying. It went directly to the elements of self-defense in manslaughter. And this was a case where there was otherwise strong evidence for the lesser included offense of manslaughter or for a self-defense theory. Mr. Wilson testified that he would not have shot Mr. Stevens unless if Stevens did not pull out a gun. Terrell, the co-defendant, also took the stand and corroborated Mr. Wilson's story. He said they did not know of the gun before approaching the car and that they were afraid for their lives. There was no other motive for Mr. Wilson and his co-defendants to shoot Mr. Stevens other than fear for their lives. And I think the video actually backs that up, demonstrating that Mr. Wilson is backing up for Mr. Stevens when he's shooting. The body language of the other co-defendants suggests fear. They're running around the corner or backing away from Mr. Stevens. Counsel, I know you wanted to save a little bit of time. Yes, Your Honor. Thank you. And for that reason, this court should grant Mr. Wilson's habeas petition. Thank you. Good morning, Your Honor. May it please the court, Jalynn Peguero for a respondent. The state court rejected Appellant's claim of prosecutorial misconduct in a decision that reasonably applied the Supreme Court's holding in Darden. And it did not unreasonably determine any facts in affirming the trial court's denial of Appellant Smith's trial motion. As Your Honors have pointed out, under AEDPA, habeas relief is not warranted unless the state court's application of Darden was an unreasonable application. And as Your Honors have pointed out, an unreasonable application is one with which no fair-minded jurist could agree. In this case, a fair-minded jurist could agree in the first place that the state court's conclusion that the prosecutor had not committed misconduct in the first place was a reasonable application. But it was an error, wasn't it, to try to inject something into the trial that could not be proven? I would disagree with that, Your Honor. So at the time that the prosecutor had asked the defendant on cross-examination, the issue of Tanner's statement to Appellant that Tanner had provided to the police had not been litigated. And so although the prosecution had informed the opposing counsel that she did not intend to call Mr. Tanner as a witness because Tanner was being tried separately, the issue of Tanner testifying had not been litigated. And also there was no evidence, there was no indication that Tanner's statement could not have come in in any other way. For instance, Appellant on cross-examination had already admitted to some unsavory evidence. And so the prosecution had no way of knowing that Appellant would not have answered her questions in the affirmative when she asked, isn't it true that Tanner had in fact told you that? Well, I'm not sure I understand that argument. The prosecutor knew he wasn't going to call the witness and he didn't have another way to bring in the statement. So you can't just ask somebody a question that is harmful to the defendant's case and then argue the theory, well, he could have just admitted to it, right? So I think it's clearly improper to have asked a question. But the question in my mind is, well, the trial court realized that and attempted to cure it. And now it's whether with the layer of at-the-deference on top of it, whether the instructions were sufficient. I'll push back on that a little bit, Your Honor, only because, again, the issue of Tanner testifying had not been litigated by the parties. The prosecution had indicated to the defense that she did not intend to call Tanner, given at that time the nature of Tanner having separated from the other court defendants. And so I would argue that nothing would have prevented the prosecution from calling Tanner as a rebuttal witness to rebut Mr. Wilson's testimony. So I'd push back on the fact that the prosecution did not know, had no way of proving this evidence coming in. And of course, obviously, the prosecution, as the trial court and the State Appellate Court concluded, could have believed, given what had happened already during drug examination, that a patent could have admitted to that unsavory fact, just as he had with other facts. And so if we move on and ... Well, the question, the point is, the comment had been made, apparently according to the record, acknowledged by the district court, that the statement was made to the police in advance of the criminal trial. But both, again, as I mentioned earlier in my question, the trial court and the California Court of Appeals acknowledged that the prosecutor was not asking about a statement Tanner had made to the police. The prosecutor was asking about a statement that may have been made to Wilson, correct? That's correct, Your Honor. And so that's why the prosecution, it had a good faith belief that Appellant could have essentially been reminded of what Tanner had told him before the shooting went down. And so I think that's the key point here, that the prosecution was not asking the defendant, didn't Tanner tell the police that you had ... His question was specifically, didn't Tanner tell you, meaning Wilson? Correct. And the state of the evidence as it stands today is that the answer is no. Appellant testified, no, he never told me that. And so the state of the evidence today is that Appellant was never told by Tanner that the victim was armed. And so I think that's the key distinction as to whether the prosecution had a good faith belief that this evidence could come in in some way, form or fashion. But again, even if we can see that the prosecution question, and then providing the transcript to the jury, was improper, I think a fair-minded jurist could agree with the state court's ultimate conclusion that it did not infect Appellant's trial in such a way that it rendered his conviction a denial of due process. I would argue that my friend on the other side said that the appellate court did not put the trial in context in evaluating the effect of the prosecution's conduct, and I would disagree with that. In assessing whether the prosecutor's conduct rendered Appellant's conviction a denial of due process, the state court considered in context both the fact that the question asked concerning Tanner was just asked once. It was never admitted. Neither the question, the answer, nor the transcript were admitted into evidence or argued to the jury. They were subject to a creative instruction, and additional instructions were provided to the jury concerning what the jurors could consider as evidence, and specifically they were told that just because a lawyer and attorney asked a question did not mean that they were to assume that the substance of the question was evidence. And also the court considered whether Appellant's claim of self-defense actually relied on the fact that he knew that the victim was armed, and the court concluded that it did not. But even moving forward, even assuming that the prosecutor committed misconduct, and that it rendered Appellant's trial fundamentally unfair, and that it led to a violation of due process, the state court went a little further and concluded that any violation, any error, was harmless beyond a reasonable doubt under Chapman. And in doing so, again, the court considered not only the creative instructions, the additional instructions, the fact that the question and the transcript were excluded from the record, from the evidence, but also that the evidence against Appellant was overwhelming. If we consider his conduct during the shooting and after the shooting, no reasonable jury could agree that he acted in self-defense. The video speaks for itself. The video shows Appellant and his car. Co-defendant Torell approaches from the passenger side. Appellant approaches from the driver's side. Torell opens the door. The victim comes out shortly thereafter, and Appellant begins shooting. Appellant shot the victim 13 times altogether, and there's no evidence in the record, as shown by the video, that the victim ever raised his right arm, ever pointed his arm, his gun at Torell or the defendant, or ever even shot his weapon. And so altogether, in context, the State Court of Appeal concluded that— What was the prosecution's theory for why this murder was committed, that it was sort of retribution for the killing the day before of the defendant's half-brother? Is that why they thought Stevens was—why they shot him? I think it was the closest that they got to, and I say that because there was no evidence that the victim, Stevens, was connected to Appellant's brother who had been shot, who had been gunned on the night before. So there was no evidence that Stevens knew— Why was he there? I'm sorry? Why was he there? Why was Stevens at that corner? So according to the record, it shows that Stevens had made an appointment with, I think, a cousin or a brother or some family member for a haircut that day. And so the evidence—according to the record, it shows that he was there that morning, presumably to get a haircut or some interaction with someone else. It does show him, obviously, parking his car initially and then leaving his car and coming back about maybe 8, 10 minutes later. And then it sounds like he was just resting in his car. But to more definitively answer the honest question, the evidence shows that he was there presumably to meet someone for a haircut is what I recall from the record. And so we don't know what the motive was for the ultimate shooting, but it sounds like that is probably the closest that we've gotten to, that it was in retaliation for the Appellant's brother who had been killed the day before. And of course, Appellant testified that when he approached Stevens was to ask him, hey, did you know what happened to my brother who was killed the night before? And so that's close as we can get to a motive for the killing of Mr. Stevens in this case. Ms. Baghero, the question about the Confrontation Clause violation wasn't actually certified before this court, correct? That's correct, Your Honor. So the government really didn't respond in briefing, but I'm essentially wading the waters of Crawford v. Washington and Davis v. Washington in terms of what is clearly established federal law. It seems to me it's a pretty high bar to find that it was so clearly established that there's a constitutional violation here, but I know you didn't have an opportunity to respond to that because it wasn't certified before this court, correct? That's correct, Your Honor. And again, the state court did address that. Yes, yes. The Crawford issue, and it ultimately found that there was no constitutional violation. And so that would be our position that under Crawford, that if your amendments juror could agree with the state court's conclusion that there was no Confrontation Clause violation in this case. Unless the court has any questions, we ask that the district court judgment be affirmed. Thank you. Thank you, counsel.  Two quick responses, Your Honors. So as to the government's argument that the statements might have come into evidence or Tanner might have testified, this court in Sanchez addressed the government's similar argument that the extrajudicial statements could have been in evidence and said that was inapplicable because the statements were never offered into evidence at trial. And that's exactly what happened here. This is a case where the state appellate court misapplied Darden, where the question and error was highly prejudicial, and this court should grant Mr. Wilson's habeas petition. Thank you. Thank you. Thank you very much, counsel. Both sides for your argument. The matter is submitted.
judges: NGUYEN, BRESS, Bennett